## Watson *et al. versus* Jones *et al.*

1. The deed of the treasurer to the commissioners of Warren county having been lost, its delivery and contents were properly proved by the books found in the custody of the proper officers.

2. Where a commissioners' deed had no seal, it was competent for the court to permit the county commissioners to seal it at the time of trial when the validity of the deed was questioned.

3. In determining the dividing lines between tracts of land, courses, calls and distances, must give way to the marks on the ground, and these marks control as well the description found in the patent as that found in the survey.

June 26th 1877. Before AGNEW, C. J., SHARSWOOD, MERCUR, GORDON, PAXSON, WOODWARD and STERRETT, JJ.

Error to the Court of Common Pleas of *Warren county :* Of May Term 1877, No. 36.

Trespass for cutting and carrying away timber and timber trees, brought by W. F. Jones and others, against Lewis F. Watson and others.

The plaintiffs claimed title to warrant tract No. 4822, and defendants to tract No. 4824. No. 4824 lies immediately north of and adjoining 4822. The lands are east of the Allegheny river, and situate in Limestone township, Warren county. The parties claimed title to their respective tracts from the Holland Land Company. January 30th 1794, a large number of warrants, including 4822 and 4824, were issued to the Holland Land Company. Surveys were made in September 1794, which were returned October 2d 1799. The defendants' tract was surveyed September 11th 1794, and the plaintiffs' September 12th 1794. The true location of the south line of 4824 and north line of 4822, as fixed by the original survey, was a question in the case.

The defendants, in support of their location of the disputed line, showed that tract 4824 and 4822 were two of a large number of warrants surveyed to the Holland Land Company by the same deputy surveyor, and at about the same time; that tracts 4837, 4819, 4838 and 4839 were surveys also of lands for the Holland Land Company; that the west and south lines of 4837 were run and marked on the ground for that tract, and also as boundaries of

[Watson *v.* Jones.]

defendants' tract on the same day, September 11th 1794.  The location of the black oak, called for as the corner of 4837, 4819, 4838 and 4824, together with the original lines running east and west therefrom, was proved and admitted on the trial.  It was also in evidence that tract 4819 was surveyed September 9th 1794, and the tracts 4837, 4838, and defendants' tract, 4824, were surveyed on the same day, September 11th 1794, by the same surveyor.  The defendants claimed that in the absence of any survey actually made on the ground, fixing their south or the plaintiffs' north boundary, that they were entitled to run south the distance called for in their survey, 265$\frac{2}{10}$ rods, and thence due west to the intersection of lands that had, before the Holland Company's survey, been warranted and surveyed to one George Mead by a different deputy surveyor.  A line thus run would include all the timber cut by defendants.

The plaintiffs claimed that the true location of their north and defendants' south line was some ninety-four rods north of the line claimed by defendants; and this, if true, would give them the timber cut by defendants.

In February 1794, a number of warrants were issued to George Mead.  These warrants were laid in April 1794, and returned July 6th 1798.  In laying those, the surveyor commenced at the Allegheny river and worked towards the east.  These surveys were made by a different surveyor from the one who surveyed the Holland Land Company's warrants.  The Mead warrants were for 1000 acres each, were rectangular in form, and laid on forty-five degree lines; the Holland Land Company's warrants were on true meridian lines.  A large number of the Holland Land warrants, including the tracts claimed by plaintiffs and defendants, were laid on the same land covered by the Mead surveys.  The Holland Company filed caveats against the issuing of patents on a large number of the Mead surveys, and on the 21st of April 1796, a compromise was effected, by which the Holland Company withdrew the caveats as to a large number of the Mead warrants, including the tracts 5250 and 5249; and Mead relinquished all claim to certain other of his warrants, covering, among others, the two tracts claimed respectively by plaintiffs and defendants, and numbered in the Holland Company's drafts as 4822 and 4824.

To locate the north line of their tract, the plaintiffs, having given in evidence the warrant and survey of 4822, introduced evidence to show that a pine at the southeast corner of Mead's warrant, 5250, was an original corner, marked as a corner of three of the George Mead warrants, and that a line run northeast from that tree a distance of 583 rods (the distance called for as the southeast line of Mead's warrant); and claimed that this distance and course marked the location of the post called for at the northeast corner of 5250, and fixed the location of the post called for in the surveys

of the Holland Land Company's tracts, 4822 and 4824, and that the dividing line would be a line run due east from this post. The southeasterly and the northeasterly lines of the Mead warrants, 5250 and 5249, were never run on the ground. The post called for at the northeast corner of 5250 was a supposititious one. Neither the east line of plaintiffs' or defendants' tracts, the dividing line between them, or the southwesterly line of defendants, or the south or northwest line of plaintiffs' tract, were originally run on the ground, and the post called for at the west end of the line dividing them was a supposititious one.

The defendants further claimed that even if the original location of the dividing line between 4824 and 4822 was as claimed by the plaintiffs, that the same was changed by the owners under whom both parties claim; and the line as claimed by defendants was adopted as the true dividing line between the tracts; and this upon the following facts, which were proved on the trial, viz:

In 1814, or prior thereto, the title of the Holland Land Company to the tracts 4822 and 4824, together with other lands, amounting to some 170,700 acres, lying in one body, became vested in the Lancaster Land Company. On the 20th of April 1814, the Lancaster Land Company placed upon record in Venango county, to which Warren was then attached, a draft of their lands, and by that draft the lands were afterwards sold in parcels. This draft dropped the original numbers of the warrants, and divided the rectangular tracts each into six subdivisions, with new numbers. The irregular tracts were not subdivided (plaintiffs' and defendants' tracts were irregular tracts), but the warrant number of plaintiffs' tract, 4822, was dropped, and No. 768 was substituted. The warrant number of defendants' tract, 4824, was dropped, and No. 769 was substituted. This draft gives the length of the line bounding both the tract of the plaintiffs and that of the defendants, together with the adjoining land of the Lancaster Land Company, and does not call for and makes no mention of the Mead land; the dividing line between 768 and 769 being a line run due west from a point $265\frac{3}{10}$ rods south of the black oak tree, the admitted corner of the original tracts, 4824, 4837, 4819 and 4838.

On the 28th of March 1814, being before the recording of the draft before mentioned, the Lancaster Land Company made an agreement in writing with a surveyor, one Samuel Dale, by which he agrees that he will go on to their lands "and will lay off the same into 772 tracts, according to the sizes and dimensions, courses and distances, of a large draft of said lands," which draft was made part of the agreement. This draft, with the exception of one or two immaterial clerical errors, is the counterpart of the one recorded. Pursuant to this agreement Dale did go on to the ground, in the summer of 1814 and 1815, and run and marked the lines and courses of the sub-divisions, and these were easily traced. Commencing at the maple in the eastern

line of No. 767, as shown by his original notes, ne run north, measuring and marking the courses of the subdivisions on the east plainly by their numbers. The dividing line between 767 and 768 he indicated by a post. The dividing line between plaintiffs' tract, 768, and defendants' tract, 769, he also indicated by a post. This post is 92 rods north of the southwest corner of sub-division No. 572, which corner is plainly marked, and at the east end of the division line, as claimed by defendants, between 768 and 769—and is 265·rods south of the black oak admitted corner. Dale marked the line running south of·the subdivision numbers 543 and 544, and line west of subdivisions 544 and 513. A few days afterwards, as shown by his notes, Dale goes back to the maple in the east line of 767 and runs and plainly marks, as the draft requires, a line south a distance of 71 rods to a chestnut tree. This tree is plainly marked by Dale in figures, 767, as the southeast corner of that tract. From the chestnut he ran west, and for 171 rods, as called for in the draft, he marked the line plainly. It was in proof that running from the west end of this 171 rod line, the courses and distances called for by the draft, as the southwesterly side of plaintiffs' tract, would locate the dividing line between the plaintiffs' tract, 768, and defendants' tract, 769, at the point claimed by defendants. Dale did not run the division line between 767 and 768, or between 768 and 769; nor did he run either the southwest line of 767, the northwest line of 768, or the southwest line of 769. From the chestnut marked by Dale as the southeast corner of tract 767, due north to the admitted black oak, the northeast corner of defendants' tract, 769, and also the corner of the subdivisions 543, 542 and 545, is 1130 rods, as given on the draft; and the recent measurements given in evidence agree with the draft and the work of Dale on the ground within from six to nine rods—showing that each of the tracts, 767, 768 and 769, have their full distances on the east line as called for by the draft put on record, and the one from which Dale made his survey, by locating the division line between 768 and 769, as claimed by defendants. But if located as claimed by plaintiffs they would have some 94 rods more, and the defendants 94 rods less than their distance as given on the recorded draft.

The plaintiffs claimed title to their tract under an alleged sale made by the treasurer to the commissioners of Warren county in 1840. No deed from the treasurer to the commissioners was shown, and there was no proof that any person had ever seen or known of the existence of such a deed. It was in proof that it was the practice of the commissioners to retain the deeds of the lands bought by them at the treasurer's ·sales, and that the package of deeds of lands bought by them in 1840 was still in the office.

For the purpose of showing sale by the treasurer to the commissioners, the plaintiffs offered and under exceptions the court admitted in evidence, a book brought from the treasurer's office. This

[Watson v. Jones.]

book was a large docket, into which the original sale lists were claimed to have been copied for many years before and after the year 1840, and both before and after 1840 were in the handwriting of Thomas Clemons. The original sale lists were burned, and no proof was given that the book offered was a copy of the sale lists, nor was any authority shown directing such a book to be kept by the treasurer.

As further evidence of the existence of a deed from the treasurer to the commissioners, the plaintiff offered and the court, under exceptions, admitted the minute-book of the commissioners, in which under the heading, "Lands purchased at treasurer's sale by county commissioners for use of the county for year 1840," it was stated that June 10th 1840, the tract 768, Limestone township, was purchased by the commissioners, and also marked "sold October 1st 1845;" and entry in the same minute-book under date of October 17th 1845, "sale of tract 768 to James A. Alexander," under whom plaintiffs claimed title.

In further tracing title the plaintiffs offered a paper claimed to be a deed from the commissioners of Warren county to James A. Alexander, dated January 30th 1846, for tract 768. The defendants objected to the deed, because the paper had neither the private seal of the commissioners nor the official seal of the county, and because no title was shown in the commissioners' deed. The court, under exceptions, admitted the paper in evidence. While the case was on trial, the plaintiffs, January 6th 1876, had the county commissioners affix the seal of the county thereto, and again offered it in evidence, and the court, under exceptions, received it in evidence in its amended form.

On the question of the dividing line between the lots the court, Vincent, P. J., *inter alia*, said:—

"This suit only involves, directly, the true location or survey of Holland Land Company warrants Nos. 4824 and 4822, the former claimed by the defendants and the latter by the plaintiffs.

"The timber which is in dispute was cut upon one or the other of these tracts; if upon a tract owned by the plaintiffs, they are entitled to recover; if upon a tract owned by the defendants, your verdict should be for them.

"The survey of tracts 5249 and 5250 were returned July 6th 1798, or more than a year after the compromise between Mead and the Holland Land Company, and we have a right to presume that it was done in pursuance of that compromise. The return of the survey of 4824 was made more than one year after the return of 5249 and 5250, and this return shows one southwest corner of the tract at a post, which in the plot of the same survey is made the northeast corner of 5250, and the southwest line of 4824 is the northeast line of both 5249 and 5250. The patents to the Holland Land Company for 4824 begins the description at a post, thence by

[Watson *v.* Jones.]

lands surveyed on warrants 5250 and 5249 northwest 640 rods to a post, which was no doubt intended to carry this line to the northwest corner of 5249, and the draft of the survey so shows. This survey is bounded on the east and in part on the north by the east and south lines of Holland Land Company's tract 4837 and west line of 4838. It also calls for tract 4822 as one of its south boundaries.

"The initial point of the survey of 4824 is a post at the northeast corner of 5250, and thence along northwest line of 5250 and 5249, and we must locate the whole survey by starting from this initial point.

"It is conceded that the surveyor did not actually run on the ground in 1794 the lines of 4824 as the lines of that tract, but that he adopted certain lines as its boundaries.

"In order, then, to find the true starting point of the survey of 4824, we must locate the true northeast corner of 5250 and the northwest line of 5250 and 5249.

"It is in testimony that a certain white pine at the southeast corner of 5250 is an original corner of the Mead survey, and the fact that it was marked for three of his tracts is evidence that it is an original corner, but it is for you to decide whether it is or not.

"If you find the white pine to be the true southeast corner of 5250, the true northeast corner of that tract is at the end of a line running due northeast 583 rods, and the true southwest line of 4824 is a line running northwest from that point; and if you find that the survey was made from the end of that line of 583 rods, and no lines were marked on the ground, the other courses and distances must conform to the known course and known line, and the true south line of 4824 and north line of 4822 will be a line running due east from the north end of the line 583 rods from the white pine, for such now we must presume to have been the intention of the surveyor if this was a chamber survey, for more than twenty-one years have elapsed since it was made and returned.

"In 1814 the Holland Land Company's land had become the property of the Lancaster Land Company, and in that year the latter company made a contract with Samuel Dale to subdivide these lands into 772 tracts. Dale did so subdivide these lands, but in doing so he adopted the lines of 4824, 4822 and 4820 as subdivision lines, running in part only the east lines of 4824, 4822 and 4820, and probably the south line of 4820. He also ran and marked the south and west lines of 4837, but there is no evidence that he run or marked any other lines of either 4824 or 4822. He adopted the other lines. At this time the Lancaster Land Company owned both 4824 and 4822, and the adjoiners on the east, and they could alter their own lines as they pleased, but the map furnished to Dale does not nor does the contract with him propose to change any of the lines of the original surveys of their lands;

[Watson v. Jones.]

and unless Dale did, by marks on the ground, do so, with their consent, before or after, the lines of the original surveys still stood after his survey as the lines of the several original tracts, and they will therefore still remain as their true boundaries, and define the extent of the ownership of the respective owners of 4824 and 4822. You will thus see that the lines originally made or adopted, as the true division line between 4824 and 4822, is the true division line between these tracts, unless it was changed by the owners before any ownership thereof by the plaintiffs, or their predecessors in title.''

The verdict was for the plaintiffs for $4800, and after judgment defendants took this writ, assigning for error, *inter alia*, the charge of the court upon the question of the dividing line, the admission in evidence of the books of the treasurer, and the admission of the commissioners' deed to Alexander, which was unsealed.

*W. D. Brown* and *R. Brown*, for plaintiffs in error.—The plaintiffs in error claim that the lines of their tract not run and marked on the ground, are to be located by the courses and distances of the survey as returned, taking the actual marked lines and corner of their own tract as the basis of the courses and distances of the lines not run. The question was not whether there was an interference between the Holland Land Company and the Mead warrants since the compromise, but did the surveys originally interfere? While it is conceded that where in official surveys, a discrepancy exists between the courses and distances and the calls for an adjoinder the latter governs, this is so only because the adjoinder has actual marks on the ground, but here neither the post corner of the Mead warrant, 5250, nor the lines in either direction from it, had been run or marked at the time of the survey of 4824, and that corner was ascertainable only by courses and distances. Why, then, should these courses outweigh the courses and distances in the survey of 4824 in determining the true south line of 4824?

The books from the treasurer's office were not competent evidence.

The paper from the commissioners to Alexander was not a deed, having neither the corporate nor private seal of the commissioners thereon, and the sealing thereof during the trial cannot by relation make it a deed prior to that time.

*Johnson & Lindsey* and *Clark & Noyes*, for defendants in error. —In ascertaining the boundaries of a tract of land, the marks of the survey on the ground are paramount, and in the absence of marks calls in the deed or grant, whether of natural or artificial monuments, are to prevail over courses and distances. If there be neither actual survey, nor calls, then the courses and distances are to govern.

In the book kept in the treasurer's office were recorded the sales of unseated lands by all the treasurers since the organization of the county, in 1819, while it was shown that all the original manuscripts of the several treasurers, prior to 1850, had been burned. The sales of unseated land were entered in 1840, in this book, in the handwriting of Thomas Clemons, then treasurer, and among them appears the sale of tract 768 to the commissioners. The best evidence possible was thus offered. The deed from the commissioners to Alexander was not invalid because of the absence of their seal, and it was competent for them to affix the seal at any time; and if the county was willing to thus perfect the deed, the grantees could not object.

Mr. Justice GORDON delivered the opinion of the court, October 1st 1877.

The treasurer's deed, for tract No. 768, to the commissioners of Warren county, having been lost, its delivery and contents were properly proved by the books found in the custody of the proper officers. In the case of Halsey *v.* Blood, 5 Casey 319, the minute of acknowledgment, made by the prothonotary, was held to be competent for such purpose, but this evidence would certainly not be superior to that furnished by the records kept by the officers who made the sale. It is urged, however, that the treasurer's sale-book offered was not competent, forasmuch as it contained but transcriptions of the sale lists, and was therefore not an original document. But we do not so regard the matter. The book appears to have been kept by Thomas Clemons, the treasurer for the year in which this land was sold, and admitting that it contained but transcriptions from his temporary lists, yet being made by himself, no doubt in order to put the evidence of his own work in a safe and convenient form, *quoad* that work, however it might be as to that of others found with it, it must be regarded as original evidence. As well might objection be made to the continuance docket, found in the prothonotary's office, because many of the entries therein contained have been transcribed from the court minutes and appearance docket. Neither can we treat with more favor the exception to the deed of the county commissioners to Alexander. Technically there can be no deed without a seal, for it is the seal which makes the deed; nevertheless we well know that a valid conveyance of land may be made without it. As long ago as McDill *v.* McDill, 1 Dall. 66, it was held, that the signing of a deed was the material part of its execution, and that the act of sealing had become a mere form. And in Huston *v.* Foster, 1 Watts 477, an objection to a commissioners' deed, that it was sealed with the private seals of the commissioners and not with the corporate seal, was not sustained. It would be difficult, however, to point out any substantial difference between the private seals

of the officers mentioned in the above case and no seals at all, for they certainly were of no significance whatever, in passing title to county lands. Indeed, it is apparent from the opinion, that the matter was so ruled in order to avoid a technicality the maintenance of which would have been productive of more harm than good. Following the same line of thought thus indicated, and we cannot but approve of the action of the court in avoiding a barren technicality by permitting the sealing of the deed by the county commissioners at the time of trial.

On the theory of the dividing line between tracts 4822 and 4824, we must dissent from the court below. As these surveys were made on warrants of the same date for the same party (the Holland Land Co.), were returned at the same time, and were, as is conceded, chamber surveys, we can give neither precedence from an apparent difference of time in location. The problem then is, to find the dividing line between two tracts of land, which as to their exterior lines, are to be treated as a single block. Were it not for the adoption of the pine of the Mead survey as the southwest corner of 4822, our task would be a simple one; for that out of the way, the black oak, the common corner for Nos. 4837, 4819 and 4838, adopted for 4824, would be the only original corner found on either tract and must govern the whole survey. We would have then, but to run south from this black oak on the line of No. 4838, $265\frac{3}{10}$ rods, and a line west from the point thus reached would definitely resolve the question. In such case it is obvious neither the interference of the Mead survey nor the calls on the west could in anywise influence the matter, for we would have to do only with the position of the division line of the two lots. Having, however, the white pine of the Mead surveys as the southwest corner of 4822, as well as the black oak corner of 4824, we have two fixed original marks found upon the ground by which the block must be governed.

The court below rejected the black oak as a dominating mark, and adopted the white pine, instructing the jury that from this point the northwest line of 4822 was to be run, and the distance 583 rods on this line would reach and fix the northwest corner of that tract, from which point the division-line was to be determined by running due east to the western boundary of 4838. But why not as well determine this line by running 265 rods south from the black oak? The only reason given by the court for its preference is that the patent for tract No. 4824 indicates, as the initial point of its description, the post at the northeast corner of the Mead survey, No. 5250; that is, at the end of the line 583 rods northeast from the pine. But this is not sound; for the patent but follows the survey. If there is an error in the survey, it is repeated in the patent; and at all events, the marks upon the ground must control as well the description found in the patent as that found in the survey. Suppose, however, we adopt the patent description, and,

[Watson *v*. Jones.]

commencing at the post, we travel around the tract in due order; where do we find the point from which to project the closing line? Certainly the patent fixes this point 265 rods south of the black oak; but if from that point we run the line on the course called for, we shall still strike the Mead line some ninety or one hundred rods southwest of the initial post corner, thus completely inverting the result arrived at by the court.    But neither will this do, for it adopts the black oak corner to the exclusion of the pine.  It is thus apparent that the true solution of this question is to be found in the adoption of both these corners; remembering, at the same time, the inflexible rule that courses, calls and distances must give way to the marks found on the ground.   Proceeding on this theory, we ascertain the northwest corner of 4822 and the southwest corner of 4824, by running the line north 45° east, 583 rods from the pine; and we find the southeast corner of the one and the northeast corner of the other at the end of the line, $265\frac{3}{10}$ rods south of the black oak, then a protraction from the one point to the other gives us the required division-line.   We have not, in this discussion, considered the subdivision surveys made by Dale for the Lancaster Land Company, as they in no manner affect the lines of the warrants in controversy.

The judgment of the court below is reversed, and a *venire facias de novo* is awarded.